**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

JOE LEE MCGIRT et al.,                    *
                                          *
        Plaintiffs,               *
                                          *
        v.                        *     **Case No. RWT 02cv3455**
                                          *
ROYAL INSURANCE COMPANY                   *
OF AMERICA et al.,                        *
                                          *
        Defendants.               *

**<u>MEMORANDUM OPINION</u>**

On or about March 24, 1997, Plaintiff Dat Tan Le ("Le") was driving a car on the Beltway in Prince George's County, accompanied by one passenger.  Le's vehicle was struck from behind by a passenger vehicle driven by Keith Blocker ("Blocker").  As a result of the collision, Le's vehicle was immobilized on the Beltway.[1]  Le turned on his hazard lights to indicate that his vehicle could not be operated, and at least one police vehicle arrived and its emergency lights were activated.  Sometime after the police vehicle arrived, a tractor trailer owned by Builders Transport ("Builders") and operated by Plaintiff Joe Lee McGirt ("McGirt") struck the rear of Le's vehicle. The impact of the tractor trailer killed the passenger in Le's vehicle and severely injured Le, both of whom were apparently still sitting in the immobilized vehicle on the Beltway.

On or about January 15, 1999, Plaintiff Le filed suit against McGirt, Builders Transport, Family Dollar Trucking (the owner of the trailer being hauled by McGirt), and Keith Blocker in the Circuit Court for Prince George's County.  <u>See</u> Compl. ¶ 19.  The Defendants in this action, Gulf Insurance Company ("Gulf") and Royal Insurance Company of American ("Royal"), refused

---

[1] It appears that Le's car was stopped in a driving lane after Blocker's car hit it, and could not be moved to the shoulder.

to provide a defense for McGirt and asserted that they had no obligation to indemnify McGirt for any damages that might be awarded to Le. Upon Gulf and Royal's refusal, McGirt and Le filed this declaratory judgment action, praying that the Court declare (1) that Defendants Gulf and Royal have a duty to defend and indemnify McGirt as to any and all claims for injuries and damages of Le, and (2) which of the two carriers (Gulf or Royal) shall be the primary provider.

## BACKGROUND

At the time of the 1997 accident, Builders was a motor carrier hauling general commodities in interstate commerce.  As such, federal law required Builders to file proof with the Interstate Commerce Commission ("ICC") that it carried at least $1 million in insurance.  On December 18, 1990, Builders was approved by the ICC, and later the Department of Transportation ("DOT"), to be a self-insured motor carrier for purposes of the financial security requirements of §§29 and 30 of the Motor Carrier Act of 1980.  See Gulf's Mot. Exh. A.  At the time of the accident, in addition to being self-insured, Builders carried supplemental insurance with Reliance National Indemnity Company ("Reliance") providing for $1 million of excess coverage above the $1 million self-insured retention, subject, however, to a $1.65 million deductible.  See id. Exh. B.  In addition, Builders purchased coverage from Gulf Insurance Company (policy number CU5832766) and Royal Insurance Company (policy number PHA101344).  See id. Exh. C & D.  The policies purchased from Gulf and Royal were for umbrella and excess coverage respectively.  Gulf's policy, running from June 1, 1996 to June 1, 1997, provided excess coverage of $13 million over the Reliance policy.  Gulf Mot. Exh. C.  Royal's policy provided coverage of $10 million in excess of

the Gulf policy.[2]  This was the insurance status of Builders at the time of the accident between McGirt and Le.

In May 1998, Builders filed for protection under Chapter 11 of the Bankruptcy Code.  On October 3, 2001, Reliance was declared insolvent and its assets liquidated by order of a Pennsylvania state court.  Because both Builders and Reliance were unable to pay any amount of the yet-to-be determined judgment against McGirt/Builders, Plaintiffs brought this declaratory judgment action against Gulf and Royal.  In the Complaint, Plaintiffs claim that the two Defendants have a duty to defend and indemnify Plaintiff McGirt for any damages awarded to Le.

Plaintiffs assert two separate arguments for their proposition that Gulf and Royal are required to "drop down" and pay "first dollar" coverage for Le's injuries and defend McGirt.  First, Plaintiffs argue that although the policies in question purport to be "excess," they both contained an MCS-90 endorsement ("MCS-90") which, they contend, requires (1) both Gulf and Royal to pay $1 million each in damages, (2) both Gulf and Royal to pay the portion of the claim Builders would have been able to pay had it not gone into bankruptcy, and (3) Gulf to pay what remains on its $13 million policy, and (4) Royal to pay what remains on its $10 million policy.  P.'s Mot. at 6.  Plaintiffs' second argument is that the policies themselves, regardless of the existence or applicability of the MCS-90 endorsement, require the insurance companies to pay first dollar coverage.

At the close of discovery both sides filed Motions for Summary Judgment.  Gulf filed a Motion for Summary Judgment, which was joined by Royal (adopting the arguments made by

---

[2]The Royal policy is attached as Exhibit D to Gulf's Motion for Summary Judgment.  On the first page, the policy period is listed as June 1, 1997 to June 1, 1998.  The accident in question occurred on March 24, 1997, not within this time frame.  It appears that this is simply a clerical mistake, because attached to Plaintiffs' Motion is another copy of the Gulf policy, Exhibit 1, in effect from June 1, 1996 to June 1, 1997.

Gulf).  On the same day Plaintiffs McGirt and Le jointly filed a Motion for Summary Judgment, and Plaintiff McGirt filed, on his own, a Motion for Summary Judgment on the Issues of Attorney's Fees and Duty to Defend.  The Court heard argument on the issues raised in the moving papers on July 18, 2005.  On September 12, 2005, Gulf filed a motion requesting leave to bring additional authority to the Court's attention, to which the Plaintiffs responded.  The Court now rules.

## DISCUSSION

### I.

### A.

Under 49 U.S.C. § 13101 et seq., Congress has delegated extensive regulatory authority over the trucking industry to the Secretary of Transportation ("Secretary").  In order to be an approved transportation provider, a motor carrier must be registered by the Secretary.  49 U.S.C. § 13901.  The Secretary is charged with registering motor carriers and assuring that they comply with congressional requirements.  49 U.S.C. § 13902.  One of these requirements is that the company "file[] with the Secretary a bond, insurance policy, or other type of security approved by the Secretary, in an amount not less than such amount as the Secretary prescribes[.]" 49 U.S.C. § 13906(a)(1).  This submission constitutes evidence of the company's financial responsibility.  Registrants are permitted to offer evidence of their financial responsibility in one of four ways: (1) by filing proof of insurance; (2) by filing proof of a guarantee; (3) by filing a surety bond issued by a bonding company authorized to do business in the United States; or (4) qualification as a self-insurer.  49 U.S.C. § 31139(e).

4

If a registrant opts for the first mode of proving its financial responsibility, 49 C.F.R. § 387.7(d)(1) provides that the registrant's insurer must maintain a "Form MCS-90 Endorsement," otherwise known as an "Endorsement for Motor Carrier Policies of Insurance for Public Liability Under Sections 29 and 30 of the Motor Carrier Act of 1980." The required language of the MCS-90 endorsement is found at 49 C.F.R. § 387.15, Illustration I and is approximately one page long. The relevant portions of the endorsement are as follows:

> The insurance policy to which this endorsement is attached provides automobile liability insurance and is amended to assure compliance by the insured, within the limits stated herein, as a motor carrier of property, with Sections 29 and 30 of the Motor Carrier Act of 1980 and the rules and regulations of the Federal Highway Administration (FHWA) and the Interstate Commerce Commission (ICC).
>
> In consideration of the premium stated in the policy to which this endorsement is attached, the insurer (the company) agrees to pay, within the limits of liability described herein, any final judgment recovered against the insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of Sections 29 and 30 of the Motor Carrier Act of 1980 regardless of whether or not each motor vehicle is specifically described in the policy and whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere. Such insurance as is afforded, for public liability, does not apply to injury to or death of the insured's employees while engaged in the course of their employment, or property transported by the insured, designated as cargo. It is understood and agreed that no condition, provision, stipulation, or limitation contained in the policy, this endorsement thereon, or violation thereof, shall relieve the company from liability or from the payment of any final judgment, within the limits of liability herein described, irrespective of the financial condition, insolvency or bankruptcy of the insured. However, all terms, conditions, and limitations in the policy to which the endorsement is attached shall remain in full force and effect as binding between the insured and the company.

P.'s Exh. 1 (Gulf Policy).

5

In <u>Canal Ins. Co. v. Distribution Services, Inc.</u>, 320 F.3d 488 (4th Cir. 2003), the Fourth Circuit gave a brief summary of the MCS-90 endorsement. The Secretary, pursuant to the authority granted by 49 U.S.C. § 13906(f) to require motor carrier insurers to append appropriate form endorsements to their policies, issued regulations mandating that every liability insurance policy covering a motor carrier contain the MCS-90 endorsement. <u>Id</u>. at 489 This authority was delegated to the Secretary as part of the Motor Carriers Act of 1980 ("MCA"), enacted, in part, "to address abuses that had arisen in the interstate trucking industry which threatened public safety[.]" <u>Id</u>.; <u>see also</u> <u>Prestige Casualty Co. v. Michigan Mutual Ins. Co.</u>, 99 F.3d 1340, 1342-1343 (6th Cir. 1996). Protecting the public was the undisputed primary goal of the MCA. <u>See</u> <u>id</u>. ("It is well-established that the primary purpose of the MCS-90 endorsement is to assure that injured members of the public are able to obtain judgment from negligent authorized interstate carriers." (citing <u>John Deere Ins. Co. v. Nueva</u>, 229 F.3d 853, 857 (9th Cir. 2000), <u>cert</u>. <u>denied</u>, 534 U.S. 1127 (2002)). To effectuate this policy goal, "the MCS-90 endorsement creates a suretyship by the insurer to protect the public when the insurance policy to which the MCS-90 endorsement is attached otherwise provides no coverage to the insured." <u>Id</u>. (citations omitted). According to the Plaintiffs, this endorsement has the effect of requiring Gulf and Royal to protect them (members of the public) by providing coverage in this unique situation where both the self-insured company and primary insurer have no funds.

**B.**

Before Plaintiffs can argue that the MCS-90 obligates Gulf and Royal, they must establish that it was part of the policies in question. Although the endorsement is, in fact, physically attached to the Gulf policy between Endorsements 8 and 9, and incorporated into the Royal policy via its wholesale adoption of the Gulf policy, Gulf and Royal contend that the MCS-90 is nevertheless not

6

part of their policies.

Under the regulatory scheme, Gulf argues that there was no need for its policy to contain an MCS-90 because Builders had sought and received approval to be self-insured. 49 C.F.R. §387.7(d)(3) provides that one manner in which a company can offer proof of its financial responsibility is by "[a] written decision, order, or authorization of the Federal Motor Carrier Safety Administration authorizing a motor carrier to self-insure under §387.309[.]" 49 C.F.R. §387.309 specifies the standards that the Federal Motor Carrier Safety Administration ("FMCSA") must use to determine whether a company's application for self-insurance will be approved. On December 18, 1990, the Interstate Commerce Commission ("ICC"), applying the provisions of §387.309, approved Builders Transport as a self-insured motor carrier. Because Builders' proof of financial responsibility was satisfied by being self-insured rather than by filing proof of insurance, Gulf asserts that the requirement of §387.7(d)(1) that an MCS-90 must be attached to Builders' insurance policy was not triggered.

Both 49 C.F.R. §387.7(d) and 49 U.S.C. §31139(e), setting forth the manner in which a registrant offers proof of its financial responsibility, are written in the disjunctive. It is therefore plain that because Builders had been approved to be a self-insured motor carrier, there was, in fact, no legal requirement to include an MCS-90 endorsement in the excess policy issued by Gulf to Builders. The Court does not agree, however, that this lack of legal compulsion leads to the conclusion that the MCS-90, *which was physically attached to the policy*, see P.'s Exh. 1 (Gulf Policy, was not "part of the Gulf policy" or "simply never took effect." Gulf's Mot. at 6. Rather, the MCS-90 was one of the endorsements to the Gulf policy, and, just as the other endorsements, it "changes the policy" and the parties are instructed to "please read [the endorsement] carefully." See P.'s Exh. 1 (Gulf Policy Endorsements 1-8). Thus, whether or not

legally required, the MCS-90 endorsement is part of the policies and should be given whatever effect it may have.

Gulf alternatively argues that the MCS-90 did not take effect because, although it was completed in all other respects, it was not counter-signed in the top right-hand corner. Endorsements 9 and 10 to the Gulf Policy directly follow the MCS-90 endorsement, which appears after Endorsement 8. Endorsement 9 states that "[i]t is understood and agreed that Form MCS-90 is cancelled effective June 1, 1996." Id. Thus, had this been the final endorsement, the Form MCS-90 would not have been effective at the time of the accident. On the very next page of the policy, however, endorsement 10 provides that "[i]t is understood and agreed that Endorsement No. 9 - Cancellation Endorsement is deleted in its entirety and replaced with the following: CANCELLATION ENDORSEMENT. It is understood and agreed that Form MCS-90 is cancelled effective June 1, 1997." Id.

For two reasons, endorsement 10 clearly indicates that both parties considered the MCS-90 endorsement to be in effect for the 1996-1997 period. First, endorsement 10 deleted endorsement 9 which canceled the effectiveness of the MCS-90 from 1996 onwards. Thus, endorsement 9 never existed. Second, the inclusion of an endorsement canceling the MCS-90 endorsement from June 1, 1997 onwards would be unnecessary and illogical if the MCS-90 had not been in effect for the June 1, 1996 to June 1, 1997 period. Thus, the Court concludes that the MCS-90 was part of the Gulf policy at the time of Le's accident.

The MCS-90 endorsement is also part of the Royal policy. The first page of Royal's policy provides that "[i]t is agreed that this policy is following the exact terms and conditions of the Gulf Insurance Company Policy Number CU5832766, except with respect to the Limits of Liability: $10,000,000. Premium: $52,500. And any coverage modification endorsements attached hereto."

P.'s Exh. 2 (Royal policy).  Because the MCS-90 was part of the Gulf policy, Royal's policy is also subject to whatever effect the MCS-90 might have.

**C.**

Because the MCS-90 was attached to, and effective during, the policies in question, the issue squarely before the Court is whether this endorsement requires Gulf and Royal, ostensibly *excess insurance carriers*, to provide coverage because Builders' self-insurance and primary policy (Reliance) failed to do so.  Gulf asserts, and Plaintiffs do not dispute, that Maryland law applies to the facts of this case.  <u>See</u> Gulf's Mot. at 13.  However, to complicate matters, the parties also do not dispute that "the operation and effect of the MCS-90 endorsement is a matter of federal law." <u>Distribution Services, Inc.</u>, 320 F.3d at 492 (citations omitted).  Because the MCS-90 endorsement is part of both insurance policies, the Court will consider both Maryland and federal law.

Under Maryland law courts are "to determine the scope and limitations of the insurance coverage[] like any other contract[.]" <u>MAMSI Life & Health Ins. Co. v. Callaway</u>, 825 A.2d 995, 1005 (Md. 2003) (citing <u>Kendall v. Nationwide Ins. Co.</u>, 702 A.2d 767, 771 (Md. 1997)).  As such, the Court's analysis "begins with the language employed by the parties." <u>Id.</u>  The Court will "give the words their 'customary, ordinary, and accepted meaning.'" <u>Id.</u> (quoting <u>Lloyd E. Mitchell, Inc. v. Md. Cas. Co.</u>, 595 A.2d 469, 475 (Md. 1991).  However, "[w]hen the terms of a contract are ambiguous, courts look to extrinsic sources to ascertain the meaning of terms." <u>Id.</u> (citing <u>Cole v. State Farm Mut. Ins. Co.</u>, 753 A.2d 553, 537 (Md. 2000)).  One of the primary disputes between the parties is the interpretation of the MCS-90.  In this instance, the extrinsic sources that the Court will consider are the federal cases interpreting this regulatory creation.  Consideration of this area of federal jurisprudence is necessary not simply because federal law controls, but because the language of the MCS-90 is decidedly not clear, at least in its application to these facts, and federal

9

case law will assist this Court in "ascertaining the meaning" of this endorsement.

As a testament to the unclear nature of the MCS-90's effect in this situation, both parties point to different clauses in the endorsement to convince the Court that their interpretation is correct. Plaintiffs argue that the endorsement clearly states that "the insurer (the company) agrees to pay . . . *any final judgment* recovered against the insured for public liability[.]" P.'s Exh. 1 (Gulf Policy) (emphasis added). Gulf and Royal argue that Plaintiffs artfully omit from this passage the language that is damaging to their case. Reinserting the omitted language, the endorsement reads as follows: "the insurer agrees to pay, *within the limits of liability described herein*, any final judgment[.]" Id. (emphasis added). Gulf and Royal argue that their policies are limited in that they are strictly excess policies. Plaintiffs then point to another provision of the endorsement, providing that "no condition, provision, stipulation, or limitation contained in the policy, this endorsement, or any other endorsement thereon, or violation thereof, shall relieve the company from liability or from the payment of any final judgment[.]" Id. This clearly cuts in Plaintiffs' favor, as it appears that the major limitation in this policy (i.e., it is excess) should not prevent the company from paying Plaintiffs' judgment. Yet, once again, the endorsement qualifies this statement with the phrase "within the limits of liability herein described." While the repetition of the phrase "within the limits of liability herein described" suggests that Defendants' position may appear to be correct, decisions applying this language lead to the opposite result.

To assist the Court's interpretation of the MCS-90, Plaintiffs cite a plethora of cases reiterating the policy goal of the MCS-90 endorsement. In general, these cases mirror the Fourth Circuit's overview in Distribution Services, Inc. For example, the First Circuit "consider[s] the ICC endorsement to be, in effect, a suretyship by the insurance carrier to protect the public—a safety net—[that] . . . simply covers the public when other coverage is lacking." Canal Ins. Co. v.

10

Carolina Casualty Ins. Co., 59 F.3d 281, 283 (1st Cir. 1995).  Similarly, the Fifth Circuit has indicated that "the policy embodied in the statutes and regulations was to assure that injured members of the public would be able to obtain judgments collectible against negligent authorized carriers."  Canal Ins. Co. v. First General Ins. Co., 889 F.2d 604, 611 (5th Cir. 1989).  And, although there is no dispute that the interpretation of an ICC/DOT endorsement is a matter of federal law, see e.g. Distribution Services, Inc., 320 F.3d at 492, the Court of Appeals of Maryland has observed that "the intent of Congress and the ICC was that the insurance company which wrote the ICC endorsement would be responsible for primary coverage, both as a matter of law and of public policy[.]"  Federal Ins. Co. v. Allstate Ins. Co., 341 A.2d 399, 410 (Md. 1975) (quoting the Maryland Court of Special Appeals opinion).

Defendant counters that these cases are inapposite to the unique situation of an *ICC-authorized* self-insured company and primary insurer experiencing such financial difficulties that they cannot provide for an injured victim. To determine whether these cases are controlling, or at least helpful, in determining the outcome of this case, a close look at the Distribution Services, Inc. case from this circuit is necessary.

Similar to many of the cases analyzing the effect of the MCS-90, Distribution Services, Inc. dealt with a member of the public injured by a truck which, at the time of the accident, was leased by the motor carrier rather than owned.  320 F.3d at 490.[3]  The operator of the truck (Lee) was

---

[3]One of the primary goals of motor carrier reform, manifested by the Motor Carrier Act and subsequent regulations, was to curtail the practice of an ICC carrier leasing equipment from unregulated independent contractors. "Unscrupulous ICC-licensed carriers would use leased vehicles to avoid safety regulations governing equipment and drivers[,] [and] [a]uthorized carriers' use of non-owned vehicles also caused confusion as to who was financially responsible for the vehicles." Prestige Casualty Co., 99 F.3d at 1342 (citations omitted). Thus, one major aspect of the ICC regulations was to make certain that, in leasing situations, the public would be entitled to recover from an entity that was covered by an insurance provider.  In many situations, both the lessor and the lessee had insurance policies in effect, some of which contained ICC endorsements, thus precipitating much litigation concerning the priority of the insurance companies.

working within the scope of his employment for Distribution Services, Inc. ("DSI"), a motor carrier that had leased the truck from AIM Leasing Company ("AIM").  Id.  At the time of the accident, DSI was insured by Canal Insurance Company which provided $1 million of liability insurance for "covered autos" and included an MCS-90 endorsement.  Absent the MCS-90 endorsement, the truck was not within the definition of a "covered auto."  AIM was insured by Pacific Employers Insurance Company ("Pacific") which provided $1 million of liability insurance for certain covered autos and also contained an MCS-90 endorsement.  Pacific's policy with AIM expressly stated in an endorsement ("endorsement 15") that its coverage was conditional, inter alia, on DSI furnishing AIM with a certificate of insurance specifying that AIM was "an additional insured on [DSI's] liability insurance policy[.]" Id. at 490-91.  Although there was a lease agreement in effect, DSI never provided AIM with this certificate.

After the accident, Canal settled with the injured member of the public for $125,000 and subsequently brought a declaratory judgment action against Pacific and AIM.  Id. at 491.  Canal argued that it was entitled to reimbursement from Pacific notwithstanding endorsement 15's exclusionary language, because the MCS-90 nullified that portion of the policy.  Id. at 492.  The Fourth Circuit noted that "whether the MCS-90 endorsement controls the allocation of loss among insurers as opposed to operating only when necessary to protect injured members of the public[,] . . . [is an] issue of first impression in our circuit." Id.  The court also noted that the circuits that have considered the issue were split.

Some courts have held that an MCS-90 endorsement does not affect the policy to which it is attached when there is a dispute as to which of two or more insurance policies should provide primary coverage *as long as the injured member of the public has recovered.*  For example, in Canal Ins. Co. v. First General Insurance Co., 889 F.2d 604, 611 (5th Cir. 1989), the Fifth Circuit

recognized that an ICC endorsement "read[s] out of the policy excess- and other-insurance clauses as against injured members of the public[,] [but] has no application to coverage disputes among insurers." Other courts, however, disagree that this endorsement should be given a "chameleon-like quality" permitting it to modify only policies vis-a-vis the public, but not vis-a-vis insurance companies. Empire Fire & Marine Ins. Co. v. Guaranty Nat'l Ins. Co., 868 F.2d 357, 366, n.13. (10th Cir. 1989). The Fourth Circuit agreed with the former cases, concluding that "the MCS-90 operates to protect the public but does not alter the relationship between the insured and the insurer as otherwise provided in the policy. Similarly, the MCS-90 endorsement cannot reasonably be read to alter the terms of the policy for the benefit of other insurers." Distribution Services, Inc., 320 F.3d at 493. Therefore, endorsement 15 in the Pacific policy was in full effect, unaltered by the MCS-90, and precluded Canal from recovering any reimbursement. Because the injured individual had recovered for her injuries, "the public protection purpose of the MCS-90 endorsement has been served." Id. at 493.

The question for this Court is what, if anything, can be gleaned from the Fourth Circuit's ruling in Distribution Services, Inc. While the thrust of Distribution Services, Inc. is that the MCS-90 is in place to protect the public, Gulf and Royal assent that, in this situation, Le was "protected" by the ICC's review and approval of Builders' self-insurance application. Their argument, essentially, is that the MCS-90 is not broad enough to encompass this isolated instance where the ICC's regulatory scheme failed to effectuate its policy goals of protecting the public. According to Gulf and Royal, the MCS-90 cannot be construed to rewrite an excess policy into a primary policy. Only when the damages incurred by the individuals reach the policy's level (*i.e.* after the $1 million self-insured retention, the $1 million Reliance policy, and the $1.65 million deductible) can the MCS-90 take effect to override limiting provisions of the policy (such as

endorsement 15 in the Pacific policy).  Moreover, Gulf and Royal argue that the risk to the public

of permitting self-insurance was recognized and accepted by Congress when it passed this reform

legislation.

The regulations codified in 49 C.F.R. § 387 (motor carrier financial responsibility) were

discussed in 46 Fed. Reg. 30974 on June 11, 1981.  46 Fed. Reg. 30974 (1981).  By way of

background, the commentary to the regulation published in the Federal Register explained that

"[t]he purpose of the financial responsibility provisions of the Motor Carrier Act of 1980 is

to . . . assure the general public that a motor carrier maintains an adequate level of financial

responsibility sufficient to satisfy claims covering public liability and environmental restoration

liability."  Id.  The issue of self-insured motor carriers was discussed at length.  It appears that the

rule-makers recognized the problems with self-insured motor carriers, see id. at 30981 ("When a

person obtains self-insurance authority the public has no protection for any outstanding claims if

that person should subsequently encounter financial difficulty."), but decided, as manifested in

49 C.F.R. § 387.309(a), that requiring high financial standards for applicants would suffice.  The

agency commentary in the Federal Register noted that, in the past "[t]he ICC has granted a limited

number of motor carriers the authority to self-insure[,]" and "[m]ost commentators agreed that the

[regulatory body] should be 'conservative' in approving applications for self-insurance."  Id.

Citing to this language, Gulf contends that leaving a member of the public unprotected, while

unfortunate, was a risk the regulatory authorities willingly decided to take.  Moreover, Gulf argues

that it was made clear that excess insurance policies carried by self-insured motor carriers *retained

the limitations inherent in their policies*.  See id. ("[T]he evidence of excess insurance filed with

the ICC is not made via regulatory form but rather via an insurance company form of certificate of

insurance.  Such a certification provides only limited protection to the public as all the policy

14

limitations, exclusions, and conditions are applicable unlike a regulatory form of certification.").

The difficulty with these arguments is that the approved self-insurance scheme, while not without obvious risks, does not contemplate the existence of an MCS-90 endorsement, but rather acts as a substitute for a policy of insurance including that endorsement. Here, however, the Court is presented with a circumstance in which two different policies include the MCS-90 endorsement, and the Court declines to give them no effect whatsoever as urged by Gulf and Royal.

In its motion bringing to the attention later authority, Gulf points to the decision of the United States District Court for Western District of Michigan in Kline v. Gulf Insurance Co., No. 1:01-cv-213, 2005 WL 2206458 (W.D. Mich. Sep. 12, 2005). In Kline, the Court held that the MCS-90 endorsement did not require Gulf, as an umbrella insurer, to act as a surety under circumstances factually similar to the instant case, but with important and vital differences. Factually, the case is similar to the instant case in that the truck was owned by Builders, and insured by both Reliance and Gulf. The United States Bankruptcy Court granted leave to the estate of the person killed in the accident with the Builders' truck to bring a wrongful death action in a Michigan state court. The parties settled the wrongful death action for $3.2 million, and the estate sought writs of garnishment against both Reliance and Gulf. As here, Builders was self-insured for the first $1 million and the Reliance policy afforded $1 million in coverage after a $1 million deductible. Unlike the present case, however, Reliance was not insolvent, and the injured victim's estate recovered $1 million under the Reliance policy. Gulf, as an umbrella insurer, successfully asserted in Kline that it only owed $200,000, claiming that it was entitled to credit for the Builders' self-insured retention of $1 million, the $1 million deductible under the Reliance policy, and the $1 million actually paid by Reliance. While this obviously left the Plaintiff with only $1.2 million out of its $3.2 million wrongful death settlement, the opinion in Kline concluded that Builders was

15

"covered for any public liabilities it may have incurred by its drivers and the public policy goals of the MCS-90 endorsement were not triggered." <u>Kline</u>, 2005 WL 2206458, at *4.

The fundamental difference between <u>Kline</u> and the instant case is that in <u>Kline</u>, the regulatory purpose of the MCS-90 endorsement was fulfilled by the payment of the minimum amount of $1 million by Reliance.  Because the legally required amount of coverage for injured victims was available and paid, this Court agrees with the court in <u>Kline</u> that the "public policy goals of the MCS-90 endorsement were not triggered."  <u>Id.</u>  Here, however, due to the unique circumstances of this case, the public policy goals of the MCS-90 endorsement were thwarted by the insolvency of both Builders and Reliance.  The question, then, is whether application of the MCS-90 endorsement should result in a different outcome in this case.

As noted above, the primary purpose of the MCS-90 endorsement is to ensure that injured members of the public are able to recover their losses caused by negligent authorized interstate carriers.  It does so by creating a suretyship by the insurer to protect the public when the policy otherwise provides no coverage to the insured.  As noted by the court in <u>Kline</u>, the endorsement "ensures someone will pick up the tab when the public is injured by the carrier's accident and the policy terms deny coverage."  Numerous decisions have described the MCS-90 endorsement as creating a suretyship.  This distinction is aptly described by the court in <u>Kline</u> as follows:

> A suretyship is not insurance.  Insurance is a contractual relationship whereby the insurer agrees to indemnify the insured against loss, damage or liability caused by an unknown or contingent event.  *United States v. Tilleraas*, 709 F.2d 1088, 1091 (6th Cir. 1983).  The insured purchases the insurer's promise to indemnify him with his premium payments.  Conversely, a surety promises to assume the responsibility for the satisfaction of an obligation incurred by the principal should he fail to pay the obligee.  *Id*. (citing 74 Am. Jur. 2d *Suretyship* § 171 (1974)).  Implicit in this arrangement is the principal's obligation to reimburse the surety for the amount he pays.  *Id*.  A suretyship has three parties; a principal, an obligee, and a surety.  *Will H. Hall & Son,*

16

> *Inc. v. Ace Masonry Const., Inc.*, 260 Mich. App. 222, 228-29 (2003)
> (citing *In re Forfeiture of United States Currency*, 172 Mich. App.
> 790, 792 (1988)).  Thus, a MCS-90 endorsement creates a suretyship
> between an interstate carrier (principal), the injured member of the
> public (obligee), and an insurer (surety).

The purpose of the MCS-90 endorsement, and the regulations mandating it, is to provide

a minimum level of financial responsibility upon which victims of licensed interstate truckers can

rely.  The applicable minimum level in this case is $1 million, and the payment by Reliance as

noted in <u>Kline</u> entirely fulfilled the purpose of the MCS-90 endorsement in that case.  Here,

however, that purpose was not and cannot be fulfilled because of the insolvency of both Builders

and Reliance, thus providing more than an adequate basis to trigger the obligation of Gulf, as a

surety for the public, to pay the minimum amount of $1 million required by the applicable

regulation.[4]

This conclusion is also borne out by the language of the MCS-90 endorsement itself.  It

mandates that coverage be provided, notwithstanding contrary policy language, "irrespective of the

financial condition, insolvency or bankruptcy of the insured."  But for the insolvency or bankruptcy

of Builders, payment of $1 million would have been made.

Gulf and Royal, however, argue that their obligations are confined to the limits stated under

their policies which contain both a floor and a ceiling.  They argue that they are simply not

obligated at all below the floor of their policies, and thus no coverage is required.  Their position,

however, is not borne out by an analysis of decisions involving circumstances analogous to this

case.  For example, in <u>American Inter-Fidelity Exchange v. American Re-Insurance Company</u>, 17

---

[4]The MCS-90 has nothing to say about the allocation of loss among insurers; its only purpose is to protect the public.
That Gulf rather than Royal bears the obligation here is a result of the specific insurance contracts and the relationships
between them: Royal's is an excess policy with respect to Gulf's.

F.3d 1018 (7th Cir., 1994), the Seventh Circuit addressed the question of the obligations of an insurer issuing a policy of insurance having coverage of $700,000 after payment by the insured of a deductible of $50,000. This total, $750,000, was the amount then required by regulation. There, as here, the obligation of the insurer did not begin until floor (there $50,000) had been met. In explaining the effect of an MCS-90 endorsement on that type of a policy, the Seventh Circuit observed that "[b]y this endorsement the insurer promises to pay the full judgment up to the regulatory minimum . . . . Thus if the policy promises $700,000 of insurance after the insured has paid a deductible of $50,000, the insurer nonetheless agrees to pay any victim a total of $750,000. Indeed, the insurer must pay the victim in full even if the loss from the accident does not exceed the deductible, a circumstance under which ordinary insurance does not kick in." 17 F.3d at 1021. The effect, then, of a MCS-90 endorsement attached to any policy, be it primary, excess or umbrella, is to act as a surety, in the absence of payment by the insured or another insurer, of the regulatory minimum, in this case $1 million.

Applying this analysis to the instant case leads to the conclusion that Gulf is required to indemnify McGirt for the regulatory minimum of $1 million in its role as a surety under the MCS-90 endorsement. This is an amount, unlike other payments made by a liability insurer, that it is entitled to recover against its insured, Builders. The obligations as Gulf as an insurer do not begin until after credit has been taken for: (1) the $1 million paid by Gulf as an MCS-90 surety for the Builders' $1 million self-insured retention; (2) the $1.65 million deductible under the Reliance policy; (3) the $1 million limit of coverage under the Reliance policy. Gulf is then obligated, above these amounts, to pay any amounts awarded against McGirt up to the maximum limits under its policy, after which Royal, with credit for the payments and credits to which Gulf is entitled, is obligated to make payments within the limits of its policy.

18

## II.

Plaintiffs additionally argue that even if the MCS-90 endorsements do not obligate Gulf or Royal to pay for the $2.65 million gap in coverage between Gulf's obligation as a surety and its obligation as an umbrella insurer,[5] the terms of the main bodies of the insurance policies themselves do so.  Plaintiffs make essentially two arguments to this effect.  First, they argue that the Gulf and Royal policies are "umbrella" rather than "excess" policies, and that such policies inherently provide "drop-down" coverage when underlying coverage is not available for some reason (here, the insolvency of Builders and Reliance).  Second, they make a textual argument based on the terms of the policies themselves.  Both arguments are without merit.

Plaintiffs' first argument—that Gulf's policy is an umbrella policy and that umbrella policies drop down—fails because, even if it is true as a general statement of common practices in the insurance industry, it is legally irrelevant: as this Court has previously held, "an insurance policy is to be read like any contract, and the words which it contains are to be given their ordinary meaning."  Highlands Ins. Co. v. Gerber Prods. Co., 702 F. Supp. 109, 112 (D. Md. 1988).  The language of the specific policies is what controls the outcome, and citations to cases in which other courts construed materially different contractual language, generalized statements about standard insurance practices, and expert testimony about those practices are all unhelpful.

Plaintiffs' second argument, applying the language of the policy itself, bears closer consideration.  The argument goes as follows:  The Gulf policy states that Gulf (or Royal[6]) "will pay on behalf of the 'Insured' those sums in excess of the 'Retained Limit'" when the "Insured"

---

[5]The gap corresponds to the $1.65 million deductible under the Reliance policy and the $1 million of unpaid Reliance coverage.

[6]Because Royal adopted Gulf's policy in pertinent part, the following discussion speaks only of Gulf; Royal's liability stands or falls with Gulf's.

is legally obligated to pay certain damages (including those at issue here).  P.'s Exh. 1 (Gulf Policy)

at 1.  The "Retained Limit" is defined to mean "whichever of the following is applicable":

> (1) with respect to any "Occurrence" or offense that is covered by "Underlying
> Insurance" or any other insurance, the total of the applicable limits of the
> "Underlying Insurance" plus the applicable limits of any other insurance; or
> (2) with respect to any "Occurrence" or offense that is not covered by
> "Underlying Insurance" or any other insurance, the amount of the
> Self-Insured Retention stated in Item 5 of the Declarations (the "Self-Insured
> Retention").

Id. at 5 (section IV.L).  "Underlying Insurance," in turn, means

> the policies listed in Schedule A – Schedule of Underlying Insurance and any
> other policies purchased or issued for any newly acquired or formed
> organization not more restrictive than the terms, conditions, endorsements,
> and limits of liability of the policies listed in Schedule A and to be
> maintained by you in accordance with Condition M of this policy.

Id. (section IV.N).  This definition of "Underlying Insurance," Plaintiffs argue, excludes both

Builders' self-insurance and the deductible under the Reliance policy; thus, the "Retained Limit"

does not encompass these amounts; and thus, a payment "in excess of the 'Retained Limit'" *will*

include these amounts.

This argument fails for two reasons.  First, even if "Underlying Insurance" does exclude

Builders' self-insurance and the Reliance deductible, it does not exclude the $1 million of coverage

under the Reliance policy itself.  Gulf's policy obligates Gulf to "pay on behalf of the 'insured'

those sums *in excess of* the 'Retained Limit'" defined above.  Id. at 1 (emphasis added).    The

"Retained Limit," as defined above, encompasses the Reliance insurance, which is explicitly listed

in Schedule A as "Underlying Insurance."   Because Gulf's policy is in excess of the Reliance

policy, and the "Occurrence" at issue in this case "is covered by" the Reliance policy, the language

Plaintiffs themselves cite excludes coverage even if Reliance is incapable of fulfilling its obligation.

Moreover, under Plaintiffs' proposed reading, if the Retained Limit encompassed only underlying

insurance policies, and not the deductibles that correspond to them, then even if Reliance and Builders were solvent, Gulf would always be liable for any deductibles corresponding to underlying policies.  Such a result would be nonsensical.

Second, Plaintiffs' argument ignores other, unambiguous language in the Gulf policy that explicitly precludes any conclusion that the bankruptcy of Builders or the insolvency of Reliance increases Gulf's liability.  An insurance policy, like any contract, "should be read as a whole so as to reflect the parties' intent."  Highlands, 702 F. Supp. at 112.  By selectively parsing specific clauses and ignoring others, Plaintiffs have ignored the clauses that make that intent clear.  The Gulf policy also provides:

> The insolvency, bankruptcy, receivership, or any refusal or inability to pay of the "Insured" and/or any insurer shall not operate to (a) deplete or reduce the "Underlying Insurance"; (b) deplete or reduce the "Self-Insured Retention"; (c) increase the Company's liability under this policy; (d) increase the Company's share of liability under this policy.  In no event shall the Company assume responsibility and/or obligations of the "Insured" and/or any other Company.

Id. at 13 (section N).  This clause addresses precisely the situation before the Court; both the insured and an underlying insurer are unable to pay, but this "inability to pay" cannot, by the terms of this section, operate to increase Gulf's liability at all.  Except for its independent liability as a surety under the MCS-90, discussed above, Gulf's liability must be precisely what it would have been if Builders and/or Reliance had remained solvent: the excess over Builders' self-insurance, the Reliance deductible, and the Reliance policy.

### III.

Plaintiffs have separately moved for summary judgment that "[i]f the Court finds in favor of Plaintiffs on the main issue of coverage, then defendants have a duty to defend the underlying tort suit" and "[i]f the Court finds in favor of Plaintiffs on the main issue of coverage, then Joe Lee

McGirt is entitled to counsel fees from defendants." Paper No. 39 (Motion for Summary Judgment as to Duty to Defend and Counsel Fees).  The Court has found in favor of Plaintiffs in part, holding Gulf partly liable under the MCS-90 endorsement.  However, this liability does not give rise to either obligation.

It is uncontested that both Builders and Reliance had contractual duties to defend McGirt and that, absent a drop-down, neither Gulf's nor Royal's policies contained any duty to defend. Gulf does have a new liability, under principles of suretyship, for $1 million in coverage under the MCS-90.  But this liability is not as an insurer at all, much less as an insurer with a duty to defend. Neither Gulf nor Royal has stepped into Builders' or Reliance's shoes as a primary insurer; thus, the condition precedent to Plaintiff's motion is not met, and there is no duty to defend.[7]

It is also "firmly established" in Maryland that "when an insured must resort to litigation to enforce its liability insurer's contractual duty to provide coverage for its potential liability to injured third persons, the insured is entitled to a recovery of the attorneys' fees and expenses incurred in that litigation."  Nolt v. U.S. Fidelity & Guaranty Co., 617 A.2d 578, 584 (Md. 1993). However, this Court has held that neither Gulf nor Royal has any contractual duty to provide insurance coverage other than the excess coverage that Gulf and Royal do not contest.  Rather, Gulf has—and Royal would have, if Gulf were unable to pay—a duty to protect the public by stepping in as a surety to the extent of $1,000,000 under the MCS-90 endorsement.  Their contentions about whether the MCS-90 applies, and what its effect should be, do not constitute the sort of recalcitrance to fulfill an insurance obligation that the Court of Appeals of Maryland intended to

---

[7]This Court refrains from deciding whether Gulf or Royal would have had any duty to defend McGirt if they had incurred drop-down liability as insurers under the terms of their policies.  The Court notes, however, that even without a legal duty to defend, Gulf may find it in its interests to defend against a claim that may make it liable for up to $1 million as a surety under the MCS-90 endorsement or for any excess over $3.65 million under its policy.

discourage in <u>Nolt</u>.  Accordingly, Plaintiffs are not entitled to attorney's fees.


**CONCLUSION**

In sum, Gulf's liability is for the first $1 million (as a surety because of the MCS-90 endorsement) plus an excess of up to $13 million after the first $3.65 million (as an excess insurer). Royal's liability is for $10 million in excess of Gulf's liabilities.  Neither Gulf nor Royal has any liability for the $2.65 million above and beyond the first $1 million, which corresponds to the $1.65 million deductible and $1 million of coverage under the Reliance policy.  Neither Gulf nor Royal has any duty to defend or any obligation to pay Plaintiffs' attorney's fees.  Accordingly, both of Plaintiffs' and Defendants' Motions for Summary Judgment will be granted in part and denied in part by separate order, Plaintiffs' Motion for Summary Judgment as to Duty to Defend and Counsel Fees will be denied, and the parties' rights will be declared.


 11/8/05                                                  /s/
DATE                                        ROGER W. TITUS
                                            UNITED STATES DISTRICT JUDGE